IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: <br> MICHAEL ANTHONY KEANE, <br>     Debtor. <br>——————————————————/ <br> BRIAN A. HOLT, Trustee, <br>     Plaintiff, <br>   v. <br> MICHAEL ANTHONY KEANE and <br> ANNA-MARIE KEANE, <br>     Defendants. <br>——————————————————/ | No. C 04-04916 WHA <br><br> **ORDER AFFIRMING BANKRUPTCY COURT DECISION** |

## INTRODUCTION

In this bankruptcy appeal, Brian A. Holt, the trustee representing unsecured creditors in a Chapter 7 proceeding, seeks to set aside the debtor's transfer of equity in a community-property residence to his ex-wife as part of a divorce settlement. This order finds that the bankruptcy judge correctly found that this was not a fraudulent transfer. Accordingly, the decision of the bankruptcy court is **AFFIRMED**.

## STATEMENT

On March 27, 2002, Michael filed a voluntary bankruptcy petition under Chapter 7, claiming total assets of $20,264.00 and total liabilities of $1,204,872.53. An adversary proceeding was commenced on September 8, 2003, with the filing of plaintiff's complaint to

1  avoid the allegedly fraudulent transfer of residential property to his ex-wife as part of a divorce
2  settlement. A bench trial was held on August 23, 2004. The Honorable Dennis Montali ruled
3  in favor of defendants on September 8, 2004; judgment was entered on September 17, 2004.
4  The trustee's motion for a new trial was denied during a hearing on October 28, 2004. This
5  appeal followed shortly thereafter.

6  The underlying facts and conclusions of law were set forth in narrative form by the
7  bankruptcy judge at the hearing on September 8, 2004 (Hearing Tr. 3:1–13:23). This order will
8  also briefly summarize the evidence contained in the record of designated items as well as the
9  trial exhibits contained in the appendix to appellant's opening brief.

10  Michael and Anna-Marie Keane were married on May 3, 1997. In December 1999, they
11  purchased their residence at 1622 Marymeade Lane in Los Altos, California, for $1,175,000.
12  Anna-Marie made a separate-property contribution of approximately $155,000 as part of the
13  $324,000 down payment. The balance of the purchase price was paid with their joint savings, a
14  loan from Michael's company, and a bank loan of $822,500, which was secured with a first
15  deed of trust.

16  In February 2000, Michael and Anna-Marie borrowed an additional $223,500, secured
17  by a second deed of trust. They had intended to use these funds to repay the money borrowed
18  from Michael's company and do some remodeling (Trial Tr. 26:9–27:1). Instead, Michael lost
19  most, if not all, of this money buying stock in Legato Systems on margin. The bankruptcy
20  judge found that "at least $216,000 was lost and probably the entire $223,500 that was
21  borrowed" (9/8/04 Hearing Tr. 3:20–22). Michael did not tell Anna-Marie about the investment
22  until after he had already lost the money (Trial Tr. 27:2–11). In addition, Michael borrowed
23  substantial sums to fund his business. A few weeks after he informed Anna-Marie that he had
24  personally guaranteed this debt, the couple separated on March 26, 2001. Michael moved out
25  of the marital residence and ceased to share in any of the expenses (*id.* 28:12–20).

26  On November 18, 2001, the couple executed a marital settlement agreement. Therein,
27  Michael and Anna-Marie, both represented by counsel, estimated that the fair market value of
28  the residence was $1,175,000 and it was encumbered by two loans totaling approximately

1  $1,030,000, leaving a net equity of $144,700.  They agreed that the residence would be assigned
2  to Anna-Marie, who would assume responsibility for all of the mortgage payments, property
3  taxes and other expenses.*  An interspousal transfer deed transferring the residence to her was
4  signed on November 19, 2001, and recorded in the Santa Clara County Recorder's Office on
5  November 28, 2001.  Meanwhile, Anna-Marie would waive all claims against Michael in
6  connection with his squandering of the proceeds from the February 2000 loan.  The marital
7  settlement agreement also assigned all business debts to Michael, explicitly acknowledging that
8  he had violated his "fiduciary duty obligations to [Anna-Marie] and the dictates of Family Code
9  Section 1100(d)."  On December 27, 2001, the Superior Court of Santa Clara County entered a
10 judgment of dissolution of marriage.

11      The bankruptcy judge began by noting that the property itself had been sold, but "by
12 stipulation, the trustee and the defendant have set aside and left in escrow $370,000 or so
13 pending the outcome of this action" (*id.* at 6:10–13).  With respect to the trustee's first theory of
14 liability under 11 U.S.C. 548(a)(1)(A) or California Civil Code § 3439.04(a)(1), its state law
15 equivalent, the bankruptcy judge explicitly found that "the divorce was not a sham; it was a real
16 divorce for all purposes" (9/8/04 Hearing Tr. 4:3–4).  Specifically, he found no evidence "that
17 the transfer of the property comes within Section 548(a)(1)(A), namely, that there was actual
18 intent to hinder, delay, and defraud creditors" (*id.* 6:14–17).

19      As for the trustee's alternative theory of fraudulent transfer under 11 U.S.C.
20 548(a)(1)(B) or California Civil Code §§ 3439.04(a)(2) and 3439.05, the bankruptcy judge first
21 noted that at the time of allegedly fraudulent transfer, the debtor was insolvent (*id.* at 4:15–16).
22 Turning to the question of whether reasonably equivalent value was received in exchange, he
23 noted that the value of the property at the time of the transfer was in dispute.

24      One appraiser, Cindy Aldrich, valued the house at $1,095,000.  Meanwhile, Gerald
25 Burch appraised the house at $1,350,000.  Michael and Anna-Marie estimated the fair market
26 value at $1,175,000 in their marital settlement agreement, which was the same as the purchase

---

* From January 2002 through August 2004, these expenses included $243,738.80 against the secured obligations, $35,048.75 in property taxes and $17,000.00 in home improvements (*see* Trial Exhibit O, included in appendix to appellant's opening brief).

3

1    price (*id.* at 4:16–25). Observing that the debt against the house was $1,030,000 at the time of
2    the transfer, the bankruptcy judge determined that the amount of equity transferred from the
3    debtor to his ex-wife would be $65,000 based on Ms. Aldrich's valuation, $145,000 based on
4    the parties' marital settlement agreement or $320,000 based on Mr. Burch's valuation. He then
5    went on to disregard the figure proposed by Ms. Aldrich because the parties' own valuation, as
6    set forth in their marital settlement agreement was "binding at the minimum" (*id.* at 5:1–13).

7         In deciding how much to weight to give to the Mr. Burch's appraisal, the bankruptcy
8    judge considered the comparable properties used in his appraisal. He was not persuaded that it
9    was appropriate to use one "2.38 miles away from the family residence, when the convention is
10   to attempt to get comps [comparables] within a mile" (*id.* at 11:14–17). Moreover, the
11   bankruptcy judge expressed concern that most of the closing dates were "in the outer edge of
12   six months prior to the subject property," especially in light of Mr. Burch's concession that
13   "summer months prices tend to be higher than in the fall and winter" (*id.* at 12:6–15). From
14   month to month, there was anywhere from a two to seven percent difference in the median
15   price. Ultimately, the bankruptcy judge decided that a five percent adjustment of the figure
16   proposed by Mr. Burch would be sufficient to account for the "downward trend that drops
17   considerably downward by December" (*id.* at 12:17–13:4). He calculated the value of the
18   property at the time to be $1,282,500 (*id.* at 13:8–17). Thus, the amount of equity transferred
19   was $252,500.

20        As for the value received in exchange, the bankruptcy judge found that there were at
21   least two antecedent debts satisfied by the transfer. First, he found that Anna-Marie could trace
22   her down-payment contribution of $155,000 to a separate property source such that "at the very
23   minimum" she had waived a claim for that amount under the marital settlement agreement (*id.*
24   at 7:5–8:8). Second, he considered the claim that Michael had breached his fiduciary duty to
25   Anna-Marie by diverting the borrowed community funds (*i.e.*, the $223,500 loan) from their
26   intended purpose in order to engage in highly-speculative margin investing. Relying upon *In re*
27   *Marriage of Czapar*, 232 Cal.App.3d 1308 (1991), the bankruptcy judge found that the
28   community had a right to reimbursement of these funds, meaning that Anna-Marie had a claim

4

1  to at least half of this amount (*id.* at 8:9–10:11). Accordingly, he found that Anna-Marie had
2  waived a claim of no less than $266,500. (By this Court's calculation, her waived claims were
3  worth at least $266,750, but this difference does not affect the outcome.)
4      When the bankruptcy judge added this to the $1,030,000 mortgage, he reasoned that if
5  the value of the property at the time of the transfer was less than $1,296,500, then "there was no
6  fraudulent transfer under any circumstances" (*id.* at 10:17–23). As described above, he found
7  the value of the property to be $1,282,500 and thus a reasonably equivalent value had been
8  received in exchange for the transfer. He concluded that "the trustee is not entitled to recover
9  under any fraudulent-transfer theory and that the defendant, Anna-Marie Keane, is entitled to a
10 judgment in her favor" (*id.* at 13:20–23).
11     At the hearing on October 28, 2004, the bankruptcy judge denied the trustee's requests
12 for reconsideration, a new trial or an amended judgment finding liability under a preference
13 theory (Hearing Tr. 3:2–7:9). He noted that counsel had previously conceded that the trustee
14 was not arguing a preference theory (*see* Trial Tr. 87:16–21) and it would be unfair to "punish
15 the defendant for proving his – her defense by rewarding the other side with a judgment on a
16 theory that wasn't pleaded" (10/28/04 Hearing Tr. at 5:5–8). The bankruptcy judge then
17 distinguished the cases raised by the trustee, which held that engaging in speculative margin
18 trading did not amount to a breach of fiduciary duty, because Michael had engaged in "more
19 than just an unsound investment." Indeed, he had diverted community funds from a mortgage
20 loan that was intended for a specific purpose (*id.* at 7:10–8:20).

## ANALYSIS

### 1. STANDARD OF REVIEW.

The bankruptcy court's findings of fact are reviewed under a clearly erroneous standard, while conclusions of law are reviewed de novo. *In re Jan Weilert RV, Inc.*, 315 F.3d 1192, 1196 (9th Cir. 2003). This means that findings of fact must be accepted unless this Court is "left with the definite and firm conviction that a mistake has been committed." *Ibid.*

The following issues have been challenged on appeal: (1) whether there was actual intent to hinder, delay, and defraud creditors; (2) whether there was adequate consideration for

the transfer; (3) whether Anna-Marie had a claim against Michael for breach of fiduciary duty; (4) whether the bankruptcy judge should have considered the value of any claims waived by Michael; (5) whether the trustee should have been permitted to amend his complaint to allege a preference; and (6) whether the transfer should be avoided under 11 U.S.C. 547.

### 2.  FRAUDULENT TRANSFER.

With regard to whether the transfer of equity in the residence at 1622 Marymeade Lane was a fraudulent transfer under 11 U.S.C. 548(a)(1)(A) or California Civil Code § 3439.04(a)(1), the finding of actual intent (or lack thereof) is a question of fact. In the absence of any evidence indicating that this finding was clearly erroneous, this order accepts the bankruptcy judge's conclusion that the divorce was not a sham. Accordingly, the bankruptcy's finding that there was no actual intent to hinder, delay or defraud creditors is **AFFIRMED**.

As for the trustee's alternative theory of fraudulent-transfer liability, this order accepts the bankruptcy judge's finding that the debtor was insolvent at the time of the transfer and agrees that the key question, also primarily factual in nature, is whether there was reasonably equivalent value exchanged for the transfer. Appellant does not appear to dispute the bankruptcy judge's finding that the value of the property at the time of the transfer was $1,282,500, such that the amount of equity transferred was $252,500. Instead, the focus of this appeal is whether the bankruptcy judge properly calculated Anna-Marie's waived claims to equal at least $266,500.

Appellant apparently concedes that Anna-Marie had a claim to her separate property contribution of $155,000, but argues that she was not entitled to the additional $111,500 claim accounting for Michael's breach of fiduciary duty. Appellant attempts to distinguish *Czapar* on the basis that Michael did not misappropriate community funds. This order disagrees. The trustee's argument that speculating in stocks is not a deliberate misappropriation misses the point. As explained by the bankruptcy judge during the hearing on the trustee's motion for reconsideration, speculating in high-risk stocks is one thing, but doing so by diverting community funds designated for another purpose without spousal consent is quite another. While appellant asserts that "[t]here is no contention that Michael secretly profited, failed to

account or even failed to disclose his trading," this is not true (Br. 17). The evidence at trial indicated that Michael failed to inform Anna-Marie of his margin trading until after he lost the money. The bankruptcy judge found that the community would have been entitled to reimbursement of the misappropriated funds and that Anna-Marie waived a claim for at least half of $223,500. This order agrees.

Appellant further asserts that Michael made his own separate-property contribution that the bankruptcy judge failed to take into account. Not only was this point improperly raised for the first time on appeal, but appellant has provided no evidence that any portion of the $324,000 down payment was paid with Michael's separate property. The record clearly reflects that the $169,000 balance was paid with community-property funds. Although appellant argues that Anna-Marie acknowledged a contribution of $100,000 borrowed from Michael's company, there is no evidence that this could be traced to a separate-property source. Even if Michael had owned the company before he was married, to the extent that this $100,000 was earned *during* the marriage, it would have been community property. Moreover, the marital settlement agreement expressly indicated that Anna-Marie's $155,000 was the only separate-property contribution; Michael never claimed any portion of the down payment as his separate property.

In summary, this order **AFFIRMS** the bankruptcy judge's ruling that there was no fraudulent transfer because reasonably equivalent value was received in exchange.

3. **PREFERENCE.**

Appellant also argues that the bankruptcy judge should have allowed a post-judgment amendment to the complaint to allege a preference under 11 U.S.C. 547. This order finds that the bankruptcy judge did not abuse his discretion in denying this eleventh-hour request. *Compare Caddy-Imler Creations, Inc. v. Caddy*, 299 F.2d 79, 84 (9th Cir. 1962)("[T]here was no clear abuse of discretion in the trial court's refusal to change the entire legal theory of the case after the introduction of all evidence was complete."). Considering that the trustee openly admitted during trial that he was *not* suing under a preference theory, he can hardly assert that it would be appropriate to amend the pleadings to include a preference claim to conform to the evidence presented. FRCP 15(b). The bankruptcy judge's ruling is **AFFIRMED**.

In any case, even if the trustee had alleged a preference in his complaint, he probably would not have prevailed. The transfer was not made within ninety days of the filing of Michael's bankruptcy petition as required by 11 U.S.C. 547(b)(4)(A). It is also far from certain whether the trustee could have proven that Anna-Marie was an insider as required by 11 U.S.C. 547(b)(4)(B). While a debtor's spouse is normally an insider, an ex-spouse is analyzed differently. *In re Schuman*, 81 B.R. 583, 585–86 (9th Cir. 1987). As the divorce proceedings were already in progress, the bankruptcy judge would have focused on the closeness of the parties and the degree to which the transferee was able to exert control or influence over the debtor. At the time of the transfer, Michael and Anna-Marie had already been separated for well over eight months and negotiated the marital settlement agreement at arms-length, each represented by counsel. There was no evidence in the record that even remotely suggests Anna-Marie exercised any undue control or influence over Michael during this process.

Furthermore, pursuant to 11 U.S.C. 547(c)(7), a trustee may not avoid a transfer as a preference if it was a bona fide payment of a debt to a spouse or former spouse "in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit or property settlement agreement." Here, the judgment of dissolution of marriage entered by the Superior Court of Santa Clara County, incorporating the marital settlement agreement would certainly qualify.

## CONCLUSION

For the reasons stated above, the ruling of the bankruptcy judge is **AFFIRMED**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: May 10, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE